UNITED STATES COURTS
SOUTHERN DISTRICT OF TEXAS
FILED
APR - 3 2006
Michael N. Milby, Clerk of Court

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **FG HEMISPHERE ASSOCIATES, L.L.C.** | § | |
| **Plaintiff,** | § | |
| **v.** | § | |
| **REPUBLIQUE DU CONGO** | § | |
| **Defendant,** | § | **CIVIL ACTION No. H-02-4261** |
| **and** | § | |
| | § | |
| **CMS OIL AND GAS COMPANY, et. al.,** | § | |
| | § | |
| **Putative Garnishees.** | § | |

**GARNISHEES' BRIEF IN OPPOSITION TO ENTRY OF A BOND ORDER, ORDER FOR DEPOSIT OF FUNDS INTO THE COURT'S REGISTRY, OR OTHER AFFIRMATIVE RELIEF AGAINST GARNISHEES, AND GARNISHEES' REPLY TO THE RESPONSES OF PLAINTIFF AND INTERVENORS TO GARNISHEES' MOTION FOR CLARIFICATION**

TO THE HONORABLE UNITED STATES DISTRICT COURT:

CMS Nomeco Congo Inc., now known as CMS Nomeco Congo LLC ("CMS Nomeco"), The Nuevo Congo Company, now known as The Nuevo Congo LLC ("Nuevo Congo LLC"), and Nuevo Congo Ltd. (collectively "Garnishees") file their brief in opposition to entry of an order for a security bond against Garnishees, an order for deposit of funds into the Court's registry against Garnishees, or other affirmative relief against Garnishees, and their reply to the responses of Plaintiff FG Hemisphere Associates L.L.C. ("FG") and Intervenors Af-Cap, Inc. ("Af-Cap"), Walker International Holdings Limited ("Walker"), and National Union Fire Insurance Company of Pittsburgh, P.A. ("NUFI") (collectively "the judgment creditors") to Garnishees' motion for clarification of the garnishment writs issued by this Court.

I.

INTRODUCTION

The judgment creditors suggest to the Court that Garnishees post a bond – a bond not to secure Garnishees' conduct, but the conduct of the Republic of the Congo. The creditors contend this relief, which would be unprecedented in Texas garnishment jurisprudence, is available based on a nebulous invocation of the Court's inherent authority; this despite the fact that the U.S. Supreme Court and the Fifth Circuit have stated specifically and repeatedly that the Court's inherent authority does not reach this far. Although such equitable relief must be based on specific fact findings and evidence, the creditors rely on what even they must admit is nothing more than a hunch – an unsubstantiated assertion that Garnishees are colluding with the Congolese government – a theory that was rejected by the only Court to actually consider it. All the while, the Congo remains silent in this Court, predictably untroubled by the notion that the creditors might find a way to impose double liability on Garnishees. The judgment creditors' novel litigation strategy will allow the Congo to have its cake and eat it too: the Congo can take its oil by force from Garnishees while simultaneously seeing the Congo's debt retired on the Garnishees' nickel. This, the judgment creditors would call equity.

The Congo and its state-owned oil company, SNPC, have made it clear that they will exercise dominion and control over the Congo's royalty oil and SNPC's working interest oil in their own territory, notwithstanding garnishment writs and orders of U.S. courts. The Congo and SNPC obtained Congo court orders compelling the December 2004 and September 2005 liftings with threats of use of public force in the event of non-compliance. On March 27, 2006, a Congo court ordered CMS Nomeco, on short notice and with no opportunity to be heard, to allow SNPC

to take its April 2006 lifting. Unless Garnishees are expected to hire a private army to engage in a shooting war with the Congo over access to the Conkouati, there is nothing that Garnishees can do to stop them.

Notwithstanding this reality, the judgment creditors ask for an order requiring Garnishees to post a multi-million dollar bond or deposit millions of dollars in cash into the court registry. The judgment creditors contend that a bond order *against Garnishees* is appropriate even though *the Congo* is exercising dominion and control over its property rights wholly within its own territory. In essence, the judgment creditors contend that Garnishees must choose between either hiring a private army to prevent the Congo from taking its oil in its own territory, or depositing millions of dollars of their own assets with this Court to provide a fund for payment of the Congo's debts out of Garnishees' pockets.

In support of their suggestion that this Court has the authority to grant such extraordinary and unprecedented relief against a garnishee, the judgment creditors make outrageous and unsupported allegations of intentional disobedience of the garnishment writs, conspiracy with the Congo, aiding and abetting of the Congo, and purported failure by Garnishees to take required actions against the Congo. Yet, the judgment creditors offer not one shred of evidence to support those baseless allegations. Garnishees' objective in this litigation is not to aid or assist the Congo in avoidance of its debts, in which Garnishees were not involved. Rather, Garnishees seek to preserve their own multi-million dollar investment in the Congo, which is threatened by events beyond their control, and to defeat the efforts of the judgment creditors to collect the Congo's bad debts out of Garnishees' pockets.

The judgment creditors have come forward with no evidence of *any* wrongdoing by Garnishees. Guilt by association is the order of the day for the judgment creditors. That

approach is designed to further their objective of foisting the Congo's debt onto Garnishees' shoulders. Yet, Garnishees' business dealings with the Congo do not make them guarantors of the Congo's unrelated debts.

When boiled down to its essentials, the judgment creditors' contention is that Garnishees have a duty to fight on behalf of the judgment creditors to establish the validity of the U.S. garnishment writs in the Congolese courts and in expensive arbitration proceedings against the Congo in Geneva. A garnishee has no such duty, but in any event, the judgment creditors have made no showing that Garnishees could have taken any action that would have changed the current circumstances – with the Congo poised to take its oil in its own territory, by force if necessary.

There is no basis, in law, equity, or fact, or as a matter of fairness, for granting any relief *against Garnishees* as a remedy for *the Congo's* conduct. In reality, the judgment creditors want a bond from Garnishees or a deposit of money into the court registry by Garnishees for the sole purpose of forcing Garnishees to move their own assets into this jurisdiction to provide a fund for collection of the Congo's debts, despite the absence of any showing of wrongdoing on Garnishees' part. For a variety of reasons, such an order is beyond the authority of a federal district court.

## II.

## SUMMARY OF ARGUMENT

Entry of an order granting affirmative relief against Garnishees in the form of a requirement for posting of a multi-million dollar bond or deposit of millions of dollars of cash into the court registry is beyond this Court's powers and improper for a variety of independent reasons.

1. The Fifth Circuit has made it clear that a federal district court's inherent powers may be invoked only where the exercise of such powers is indispensable to reaching a disposition of the case. Those powers may not be used to provide security for a prospective judgment, and the Fifth Circuit has specifically rejected their use to require a garnishee to deposit assets with the Court to secure a prospective garnishment judgment, precisely the action sought by the judgment creditors in this case.

2. As FG has repeatedly acknowledged, the pendency of the immunity appeals under the FSIA deprives this Court of the jurisdiction to address merits issues in this case until the Fifth Circuit decides those issues. Consistent with this rule, the Court has previously determined that it will defer decision on the jurisdictional and service objections that Garnishees have raised until after the Fifth Circuit rules on the immunity appeals. An order granting affirmative relief against Garnishees in the form of an order requiring posting of a bond or deposit of funds into the court registry would require this Court to resolve jurisdictional and merits issues against Garnishees, despite the fact that the pending immunity appeals preclude this Court from doing so.

3. This Court has determined that it is required to defer consideration of jurisdictional issues until after the immunity appeals are decided, yet Fifth Circuit authority mandates that affirmative relief, including interim equitable relief, cannot be granted until the jurisdictional issues are resolved. If the Court chooses to address those jurisdictional issues (notwithstanding the pendency of the immunity appeals), there is no rational basis for the Court's exercise of in rem or in personam jurisdiction. None of the Garnishees has had any connection to the State of Texas since July 2004, and there is no connection between the April oil lifting and the State of Texas.

4. The entry of an order requiring Garnishees to deposit a bond or cash with the Court would require the Court to adjudicate the validity of the acts of the Congo in exercising dominion and control over its property in its own territory, with the assistance of its courts. Such adjudication would violate the act of state doctrine.

5. An order requiring Garnishees to deposit a bond or cash with the Court for a purported "violation" of the garnishment writs would be contrary to the foreign compulsion doctrine, which precludes the granting of relief against a party for complying with a foreign court order when the action in question is to take place within the territory of the foreign court under the law of that foreign state.

6. The entry of such an order would also require the Court to determine that its writs are enforceable. If the Court were to determine that the pending immunity appeals do not preclude consideration of the merits of those issues, the undisputed facts demonstrate that the writs are not enforceable, not only by virtue of the valid jurisdictional and service objections and by virtue of the act of state doctrine and foreign state compulsion doctrine, but also because Texas garnishment law does not permit garnishment of non-monetary obligations and because enforcement of the writs would violate the garnishment law principles that require that Garnishees be protected from double liability or other loss.

7. The entry of such an order would require this Court to not only determine that its writs are enforceable, but that they capture the April 2006 lifting. The writs issued by this Court do *not* capture the April 2006 lifting, as the Congo did not have the right to take that lifting at the time of purported service of the writs or as of the answer date of the writs. As a matter of Texas garnishment law, a garnishor may gain only the rights the judgment debtor possesses at the time of service and answer dates. Because the Congo did not have the right to take the April 2006

lifting as of the service or answer dates for any of the writs issued by this Court, there is no legal basis for any contention that the April 2006 lifting will violate any order of this Court, and no basis for ordering any relief against Garnishees for such an alleged "violation."

8. Finally, even if all of the foregoing issues are ignored, there is no basis for concluding that an order requiring Garnishees to provide a fund for collection of the Congo's debts out of Garnishees pockets is fair or equitable. Garnishees are guilty of no wrongdoing, and such an order would violate fundamental principles of justice.

**III.**

**THE FACTS**

The "evidence" attached to the judgment creditors' submissions consists of (1) agreements relating to the Marine 1 permit, (2) a copy of an over/under statement, (3) a transcript of a hearing before Judge Sparks in the Western District of Texas, and (4) a newspaper article discussing the Congo but making no mention of Garnishees. None of these materials even purports to show any wrongdoing by Garnishees. A review of the *evidence* demonstrates that Garnishees have not ignored this Court's orders and cannot stop the Congo from taking its oil without hiring a private army to engage in a shooting war with the Congo in its own territory, in contempt of the Congo court.

*Garnishees have not "chosen to ignore writs issued" by this Court, nor have they "permitted the Congo and SNPC" to lift the oil.*

Since the issuance of the first writs by this Court in October 2004, two SNPC liftings of the Congo's royalty oil and SNPC's working interest oil have occurred, one in December 2004 and one in September 2005. Garnishees informed the Congo that the December 2004 lifting would not be permitted, and the Congo then took the lifting under compulsion of Congo court

orders and threats of detention and use of public force.[1] Although FG's lawyer asserted at the hearing before this Court on March 29, 2006 that the arrangement of tugs in advance of the December 2004 lifting shows that Garnishees did not mean what they said when they told the Congo that no lifting would be permitted, FG's argument ignores the undisputed fact that this Court issued writs as to the SNPC working interest only on December 23, 2004, *after* the tug arrangements had been made for a partial lifting that did not include the Congo's royalty oil.[2] When CMS Nomeco learned of the new SNPC writs, CMS Nomeco's President informed representatives of the Congo that *no* lifting would be allowed.[3] It was only under compulsion of the Congo court orders issued on December 28, 2004, and threats of detention and use of force of public authorities, that CMS Nomeco's president acquiesced in the lifting.[4] Neither FG nor any of the other creditors have presented any evidence that Garnishees chose to ignore the writs.

Similarly, in July 2005, in response to notification from Garnishees that the next lifting would not be allowed in light of U.S. writs and court orders, a Congo court entered two new orders compelling the government lifting of the Congo's royalty oil and SNPC's working interest oil.[5] Those orders were entered by the Congolese court before the time of making arrangements for that next lifting, which did not occur until September 2005.[6] Those orders stated that the U.S. court orders were unenforceable both as a matter of Congolese public policy and by virtue of the fact that the proponents of the orders had not sought recognition of those orders in the Congo.[7] The lifting was taken under compulsion of Congo court orders.[8]

---

[1] *See* Declarations of Maryse Bernard attached as Exhibits A and B.
[2] *See* Declaration of Maryse Bernard attached as Exhibit B.
[3] *Id.*
[4] *Id.*
[5] *See* Declaration of Maryse Bernard attached as Exhibit B.
[6] *Id.*
[7] *Id.*
[8] *Id.*

In the same way, Garnishees have responded to the most recent writs, which FG attempted to serve in February 2006, by notifying the Congo and SNPC that the next lifting will not be permitted.[9] SNPC notified Garnishees of its position that the U.S. writs are unenforceable, as against Congo public policy and international public policy.[10] Garnishees again informed SNPC that no lifting would be allowed.[11] SNPC then obtained a Congo court order on Monday, March 27, 2006, compelling CMS Nomeco to deliver the oil at the April lifting, with immediate enforcement notwithstanding appeal, with the use of public authorities to ensure enforcement if necessary.[12]

These facts demonstrate that contrary to the judgment creditors' baseless allegations, Garnishees have not "chosen to ignore the writs" and have not "permitted" the Congo to lift the oil. To the contrary, Garnishees simply have been subjected to the Congo's exercise of dominion and control over its oil, with the assistance of its courts, a matter over which Garnishees have no control.

*Garnishees did not "refus[e] to take action available to them to ensure compliance with this Court's writs."*

At the hearing on March 29, counsel for all of the judgment creditors were critical of Garnishees' failure to aggressively argue in the Congolese courts and in arbitration in Geneva that this Court's orders are enforceable and that they preclude the Congo from taking its oil. None of these contentions has any validity.

As a threshold matter, none of the judgment creditors has provided any evidence showing, or provided any colorable argument supporting their contention, that Garnishees could

---

[9] *Id.* and Exhibit 9 thereto.
[10] *Id.* and Exhibit 10 thereto.
[11] *Id.* and Exhibit 11 thereto.
[12] *Id.* and Exhibits 12 and 13 thereto.

have done anything differently that would have stopped the Congo's exercise of dominion and control over its oil during the December 2004 and September 2005 liftings of oil in the Congo. Nor have they shown that Garnishees can do anything, short of hiring a private army to engage in armed conflict with the Congo, to stop the upcoming April lifting.

Garnishees received notice of the December 2004 application and the hearing thereon at 1:00 p.m. on the afternoon of the hearing, when CMS Nomeco's acting deputy general manager was served with the summons at CMS Nomeco's offices in Point Noire, Congo and escorted to the court for the hearing that same afternoon.[13] Under those circumstances, CMS Nomeco was unable to retain counsel for the hearing, and the order requiring the lifting was entered the same day.[14] Late that afternoon, CMS Nomeco's president was shown copies of the Congo court orders and told that she would be detained and that public force would be used if the Congo court orders were not followed.[15] The judgment creditors have provided no explanation of what Garnishees could have done differently that would have prevented the Congo from taking the lifting on December 28-29, 2004.

The same is true of the lifting taken in September 2005, under compulsion of Congo court orders. The Congo court determined that any order interfering with the Congo's exercise of its rights to take oil in its own territory was contrary to the Congo's public order and unenforceable in the Congo.[16] The Congo court ordered CMS Nomeco to deliver the oil.[17] The judgment creditors have done nothing to establish the validity and enforceability of their writs in

[13] *See* Declaration of Benoit de la Fouchardiere attached hereto as Exhibit C.
[14] *Id.*
[15] *See* Declaration of Maryse Bernard attached as Exhibit A, and Declaration of Maryse Bernard attached as Exhibit B and Exhibit 5 thereto.
[16] *See* Declaration of Maryse Bernard attached hereto as Exhibit B and Exhibits 7 and 8 thereto.
[17] *Id.*

the Congo and have made no showing that Garnishees could have done anything differently that would have changed that result.

SNPC's response to CMS Nomeco's notifications that Garnishees would not allow the upcoming April 2006 lifting was to obtain another Congo court order compelling the delivery.[18] Contrary to the contentions of the judgment creditors' counsel at the hearing before this Court on March 29, 2006, CMS Nomeco was not served with the summons from the Congo court on March 22, and nothing in the order suggests service on that date.[19] CMS Nomeco was not served with the summons until approximately 10:45 a.m. on March 27, 2006, for a hearing scheduled for 11:00 a.m., with the service on the secretary of CMS Nomeco's finance director in Point Noire, Congo.[20] In light of the short notice, no opportunity was provided for CMS Nomeco to be heard in response to the summons.[21] CMS Nomeco had retained counsel in Point Noire, Mr. Jean Petro, to represent its interests in the event a court action was filed.[22] However, when CMS Nomeco's finance director attempted to contact Mr. Petro following receipt of the summons, he was unreachable.[23] Again, the judgment creditors have done nothing themselves and have provided no explanation as to what Garnishees could have done under the circumstances to change the outcome.

The Convention's arbitration provision provides no opportunity to avoid the Congo court orders. The Congo and SNPC presented their applications as emergency applications to the Congolese court. Any suggestion that the Court would have refused to act on the emergency

---

[18] *See* Declaration of Maryse Bernard attached hereto as Exhibit B and Exhibits 12 and 13 thereto.
[19] *See* Declaration of Maryse Bernard attached hereto as Exhibit B, Declaration of Elisabeth Bilongo attached hereto as Exhibit D, and Declaration of Arnaud LeBlanc attached hereto as Exhibit E.
[20] *Id.*
[21] *Id.*
[22] *See* Declaration of Maryse Bernard attached hereto as Exhibit B and Declaration of Arnaud LeBlanc attached hereto as Exhibit E.
[23] *See* Declaration of Arnaud LeBlanc attached hereto as Exhibit E.

application related to the Congo's property located in the Congo, by virtue of the existence of an arbitration clause, is rank supposition. Apparently, the judgment creditors would have this Court believe that the Congo court would have left the Congo and SNPC without any remedy for their contention that they were entitled to emergency relief compelling delivery of the oil, if Garnishees had simply informed it that the Convention contained an arbitration clause. There is no basis for such supposition.

Equally baseless is the judgment creditors' contention that CMS Nomeco could have somehow upheld the validity of this Court's writs vis-à-vis the Congo by initiating an ICSID arbitration. The judgment creditors are aware that Walker obtained an arbitration award against the Congo, and the Congo has ignored it. As such, there is no reason to believe that even if CMS Nomeco argued and convinced the arbitrator that as a matter of Congolese law, a U.S. garnishment writ trumps the requirements of the Convention, a Congolese court would respect that decision any more than it respected the garnishment writs or Judge Sparks's turnover order. The Congolese court has determined that any order that interferes with the Congo's taking of its oil in its own territory violates the Congolese public order and is not enforceable.[24]

Af-Cap also argues that Garnishees should have and could have appealed the Congo court orders to the "OHADA treaty courts." Af-Cap does not explain this argument, which is completely baseless. The OHADA treaty courts only have jurisdiction to decide issues of interpretation of the OHADA laws.[25] None of the applications filed with the Congo courts by the Congo and SNPC raised any OHADA interpretation issues, and the OHADA courts did not have jurisdiction.[26]

---

[24] *See* Exhibits 7 and 8 to the Declaration of Maryse Bernard attached hereto as Exhibit B.
[25] *See* Exhibit 1 to Declaration of Brian Wrathmell attached hereto as Exhibit H.
[26] *See* Exhibits 3, 4, 7, 8, and 13 to the Declaration of Maryse Bernard attached hereto as Exhibit B.

Garnishees have appealed the 2004 and 2005 Congo court orders, but the appeals remain pending.[27] The judgment creditors have not taken any action on their own and they have not shown that Garnishees could have taken any different action related to the appeals that would have resulted in any different outcome.

It is important to note that the judgment creditors speak out of both sides of their mouth in arguing that Garnishees could have avoided the Congo court orders by taking additional or different actions in response to the Congo court proceedings. Each of the Congo court orders relies in part on the fact that the proponents of the writs and orders have not sought recognition in the Congo under the recognition procedure that exists in that country. The judgment creditors, with the knowledge that the Congo court determined in December 2004 that compliance with this procedure was a basic and fundamental requirement for recognition of the U.S. writs and orders in the Congo, have elected to take no action to obtain such recognition in the Congo. At the hearing before this Court on March 29, 2006, the judgment creditors suggested that such an effort would have been fruitless, yet they fail to explain why their efforts would have been fruitless, but additional or different efforts by the Garnishees would not have been equally fruitless. The judgment creditors cannot have it both ways.

Considering the facts, as proven by the *evidence* (not unsupported allegations), Garnishees could do nothing to prevent the situation that exists today, with the Congo poised to take its oil for a third time under compulsion of Congo court orders and the threat of use of force in the event of non-compliance.

In any event, the underlying premise of the judgment creditors' argument is that Garnishees had a duty to fight aggressively, at their own expense, for enforcement of the writs

[27] *See* Declaration of Maryse Bernard attached as Exhibit B.

and orders in the Congo and in an arbitration on behalf of the judgment creditors. That premise finds no support in garnishment law. A garnishee is a stranger to the underlying debt transaction, and garnishment therefore is a harsh remedy that is to be strictly construed. *Varner v. Koons*, 888 S.W.2d 511, 513 (Tex. App. – El Paso 1994, orig. proc.). Nothing in the garnishment rules or statutes imposes a duty on a garnishee to engage in litigation with the judgment debtor in other jurisdictions to fight for enforceability of the garnishment writs in those jurisdictions.

When all facts are considered, one controlling fact remains: Garnishees have done nothing wrong. The only actions they have taken that the judgment creditors contend were in violation of this Court's writs were actions that were compelled by Congolese court orders concerning activities in the Congo that were subject to enforcement by Congolese public authorities in the Congo. Resistance of the most recent order will lead to the significant risks of oil spill, explosion, personal injury, armed confrontation, jailing of personnel, and an international incident, all as described and proven in Garnishees' motion for clarification, to which the judgment creditors have offered no controverting evidence.

*Garnishees have not "aided and abetted" the Congo or engaged in a "conspiracy" with the Congo.*

Af-Cap and Walker allege in their joint response to the motion for clarification that Garnishee CMS Nomeco "is a co-conspirator (or aider and abettor)" of the Congo in a scheme to defraud the judgment creditors. Af-Cap and Walker Joint Response at 2. Af-Cap and Walker point to no evidence supporting their "co-conspiracy" and "aiding and abetting" allegations, and in fact, Judge Sparks in the *Af-Cap* litigation expressly rejected the precise allegations made by Af-Cap in that litigation. As shown by Af-Cap's motion attached hereto as Exhibit F and Judge Sparks's order attached hereto as Exhibit G, Af-Cap argued in its litigation in the Western District that Garnishees were guilty of aiding and abetting the Congo in evading its debts. Judge

Sparks expressly rejected the aiding and abetting allegations, concluding that there was no evidence of any such conduct by Garnishees. Af-Cap is simply attempting to relitigate that issue on which it lost in the Western District, without submitting any evidence in support of its allegation.

As the facts discussed above and proven in the attached declarations show, Garnishees have not aided and abetted the Congo and have not engaged in a conspiracy with the Congo. Garnishees were not involved in the underlying debt transactions, yet the litigation filed by the judgment creditors has put Garnishees' investment at risk and subjected them to the risk of imposition of double liability. Garnishees are fighting to protect their own interests, not those of the Congo, and the judgment creditors have come forward with nothing other than unsubstantiated conjecture in their efforts to show the contrary.

## IV.

## ARGUMENT

The judgment creditors have filed no motion seeking any relief against Garnishees, yet they have suggested in a letter to the Court and in responses to Garnishees' motion for clarification that this Court should enter an order requiring *Garnishees* to put up a bond or pay millions of dollars into the court registry, in the event *the Congo* takes the April lifting under authority of the Congo court order and threats of use of force in the event of non-compliance. In response to those contentions, and in the absence of any motion requesting such relief, the Court scheduled a hearing on April 4, 2006 for the hearing of arguments on the question of whether the Court should order such affirmative relief against Garnishees. For the reasons set out below, this Court has no authority to order, and should not order, any such relief against Garnishees.

### A. This Court Lacks "Inherent Power" to Enter an Order Against Garnishees Requiring the Posting of a Bond, Deposit of Funds into the Court Registry, or Any Other Affirmative Relief

The judgment creditors contend that this Court has the power to do whatever it wants to protect the judgment creditors' potential garnishment judgment. But, as the court implicitly recognized at the March 29, 2006 hearing, neither statutory law nor the Federal Rules of Civil Procedure authorize the judgment creditors' bond request. More importantly, however, the request is beyond the farthest reaches of a district court's inherent powers.

Regardless of how it is characterized, the judgment creditors' demand is nothing more than a request for prejudgment attachment. *Mitsubishi Int'l Corp. v. Cardinal Textile Sales, Inc.*, 14 F.3d 1507, 1521 (11th Cir. 1994) ("When faced with motions appearing to call for an attachment but labeled something else, federal courts... look past the terminology to the actual nature of the relief requested."). And a district court may not use attachment, a bond, or a preliminary injunction to freeze assets without a judgment, a lien, or any other basis for invoking the court's equitable power. *Grupo Mexicano de Desarrouo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319-33 (1999); *Fredeman v. Channel Fueling Service*, 843 F.2d 821, 824-28 (5th Cir. 1999); *ITT Cmty. Dev. v. Barton*, 569 F.2d 1351, 1358-61 (5th Cir. 1978).

The Supreme Court addressed the parameters of a district court's equity jurisdiction in *Grupo Mexicano*. The complaint there included allegations "that the defendant was dissipating its assets and planning preferential payments or fraudulent transfers." 527 U.S. at 322. The Supreme Court vacated the preliminary asset-freeze injunction, holding that federal courts' equitable power does not reach that far. *Id.*

The Supreme Court's reasoning relied upon the "well-established general rule that a judgment establishing the debt was necessary before a court of equity would interfere with the debtor's use of his property." *Id.* at 321. Justice Scalia's majority opinion explained:

> The rule requiring a judgment was a product, not just of the procedural requirement that remedies at law had to be exhausted before equitable remedies could be pursued, but also of the substantive rule that a general creditor (one without judgment) had no cognizable interest, either at law or in equity, in the property of his debtor, and therefore could not interfere with the debtor's use of that property.

*Id.* at 319-20. He emphasized that a creditor must obtain a lien or interest in a debtor's property before a court may gain equitable jurisdiction to enjoin the debtor's use of his own property, noting:

> that federal courts in this country have traditionally applied the principle that courts of equity will not, as a general matter, interfere with a debtor's disposition of his property at the instance of a nonjudgment creditor. We think it incompatible with our traditionally cautious approach to equitable powers, which leaves any substantial expansion of past practice to Congress, to decree the elimination of this significant protection for debtors.

*Id.* at 322.

The Fifth Circuit applied these same principles twenty-one years earlier in *ITT Community Development v. Barton*, 569 F.2d 1351 (5th Cir. 1978). There, the district court entered an injunction that ordered garnishees to deposit funds into the court registry prior to a judgment in the garnishment action—the same relief the judgment creditors seek here. *Id.* at 1353-62. In finding that the district court had no authority to require the garnishees to deposit the funds into the court registry to secure payment of a possible garnishment judgment, the Fifth Circuit reasoned:

> The challenged order would create a precedent of sweeping effect. . . . Every suitor who resorts to chancery for any sort of relief by injunction may, on a mere statement of belief that the defendant can easily make away with or transport his money or goods, imposes an injunction on him, indefinite in duration, disabling

> him to use so much of his funds or property as the court deems necessary for security or compliance with its possible decree. And, if so, it is difficult to see why a plaintiff in any action for a personal judgment in tort or contract may not, also apply to the chancellor for a so-called injunction sequestrating his opponent's assets pending recovery and satisfaction of a judgment in such a law action. No relief of this character has been thought justified in the long history of equity jurisprudence.

*ITT Cmty. Dev.*, 569 F.2d at 1361 (emphasis in original) (quoting *DeBeers Consolidated Mines, Ltd. v. United States*, 325 U.S. 212, 222 (1945)). As a result, the Fifth Circuit held that the district court's order, requiring the garnishees to deposit the funds into the court registry, "cannot be sustained as a proper exercise of the district court's inherent power to perform its duties and to process the pending litigation to a just conclusion." 569 F.2d at 1361.

The situation here is no different. In its letter to the Court, NUFI specifically states the bond is necessary to ensure "the various Garnishors will have some remedy at the end of the day if their rights are upheld." NUFI's March 28, 2006 letter at 2. There is no question that having money in the court registry would make collection of a potential judgment more convenient for the judgment creditors but, as the Fifth Circuit recognized in the *ITT* case, the district court's inherent powers are "not sources for mere orders of convenience." *Id.* at n.20. As the Court recognized, "[a]ction taken by a federal court in reliance on its inherent powers must somehow be indispensable to reaching a disposition of the case." *Id.*

This garnishment litigation has seen two previous oil liftings --- one in December 2004 and one in September 2005. The garnishment litigation has continued notwithstanding those liftings. The judgment creditors simply claim that Garnishees are liable for a money judgment for the value of the oil lifted. They now seek a bond, not because it is "indispensable to reaching a disposition of the case," but because they would prefer to be secured creditors rather than

unsecured creditors. *ITT* precludes such relief under the guise of an exercise of "inherent powers."

Despite the existence of controlling case law from this circuit, NUFI relies on *HMG Property Investors, Inc. v. Parque Industrial Rio Canas, Inc.*, 847 F.2d 908 (1st Cir. 1988), to support its argument that this Court should require Garnishees to post a bond. However, *HMG Property* is not on point.[28]

The plaintiff there, HMG Property, sued to foreclose its mortgage on a parcel of real property. *Id.* at 910-11. HMG Property argued that the mortgagee defaulted on the mortgage loan and its obligation to pay the property taxes. *Id.* at 911. During the course of the litigation, the property became subject to potential sale due to the non-payment of property taxes. *Id.* In response, the district court ordered that Parque, the mortgagee, pay the outstanding taxes or post a bond to cover the arrearage and the next six months' tax payments so that the plaintiff could pay the taxes without diluting its security position. *Id.* On appeal, Parque argued that the district court abused its discretion in ordering the bond.

The First Circuit affirmed the district court's bond order on two bases: 1) state law specifically supported the court's order, and 2) the district court possessed inherent power to issue the order. The First Circuit noted that Federal Rule of Civil Procedure 64 provides that "seizure of . . . property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action are available under the circumstances and in the manner provided by the

---

[28] None of the other cases cited by NUFI supports the Court's ability to order a bond in this garnishment action. *See Natural Gas Pipeline Co. v. Energy Gathering*, 2 F.3d 1397 (5th Cir. 1993) (citing *ITT* and holding that inherent power did not provide the court with authority to order a non-party to produce documents); *Pedraza v. United Guar. Corp.*, 313 F.3d 1323 (11th Cir. 2002) (finding that the court's inherent powers did not justify including attorneys' fees in a Rule 7 cost bond absent a finding of bad faith); *G. Heileman Brewing Co. v. Joseph Oat Corp.*, 871 F.2d 648 (7th Cir. 1989) (finding that the court had inherent power to order litigants to appear at a pre-trial settlement conference).

law of the state in which the district court is held. . . ." Fed. R. Civ. P. 64. Thus, Rule 64 requires the court to examine state law to find an appropriate analog for the bonding order. Puerto Rican law contains such a provision. Rule 56.1 of the Puerto Rico Rules of Civil Procedure provides

> In every action, before or after entering judgment, and on motion of claimant, the court may issue any provisional order it may deem necessary to secure satisfaction of the judgment. The court may order . . . any . . . measure it deems necessary, according to the circumstances of the case. In every case in which a provisional remedy is sought, the court shall consider the interests of all the parties and shall adjudicate as substantial justice may require.

*Id.* at 913 n.8. Because Puerto Rican law specifically contemplated the action taken by the district court, and because the loan documents unequivocally provided that Parque was ultimately responsible for payment of the property taxes, the court of appeals found that the issuance of the bond order was not an abuse of discretion. *Id.* at 914.

The *HMG Property* court also examined the district court's inherent power to issue the bond order. Interestingly, the First Circuit cited *ITT* for the proposition that courts have inherent powers "to process litigation to a just and equitable conclusion." *Id.* at 915. In finding that the district court had the inherent power to order the bond, the First Circuit noted that HMG Property had shown a considerable likelihood of success in its foreclosure suit. *Id.* at 916. Moreover, the bond served to safeguard the real property that was at the heart of HMG Property's foreclosure action. As such, the First Circuit reasoned that the bond order was a "measured and appropriate exercise of the court's inherent powers." Id.

This case differs from *HMG Property* in several fundamental aspects. First, *HMG Property* involved a direct action between a mortgagor and a mortgagee. In contrast, this garnishment action is ancillary to the suit on the underlying debt. Garnishees are innocent parties who have been hauled into court because of the judgment debtor's default. Whereas

Parque was a party to a contract that required it to pay property taxes, Garnishees have no contractual liability to the Congo's judgment creditors. Parque's failure to pay the property taxes threatened HMG Property's position as a secured creditor, as its secured position would be adversely affected if it were required to increase its debt by paying the taxes. On the other hand, the judgment creditors in this case are unsecured creditors vis-à-vis their efforts to obtain a judgment against Garnishees. The judgment creditors simply want to be converted from an unsecured creditor to a secured creditor, a remedy that the Fifth Circuit said in *ITT* falls outside a district court's inherent powers.

Moreover, Garnishees have challenged the propriety of the garnishment writs on multiple alternative and independent bases, many of which have yet to be ruled upon by this Court or are pending in the United States Court of Appeal for the Fifth Circuit. Thus, far from establishing a "considerable likelihood of success," the judgment creditors' position vis-à-vis the Garnishees is tenuous at best. Accordingly, Garnishees' position is not analogous to that of Parque in *HMG Property*.

Furthermore, Texas law does not contain a provision analogous to the Puerto Rican rule relied upon by the court in *HMG Property*. Instead, Texas garnishment law provides the procedural vehicle by which a judgment creditor may obtain debts or effects in the hands of an innocent garnishee. In this case, the judgment creditors have obtained several independent garnishment writs, which have been purportedly served on the Garnishees. Garnishees answered the various writs, raising jurisdictional and other objections to the enforceability of the writs, and denying that they were indebted to the judgment debtor or that they possessed any effects belonging to the judgment debtor. Garnishees' answers were subsequently controverted by FG. Tex. R. Civ. P. 673, 674. To date, any issues of fact raised by Garnishees' answers to the writs

and FG's controverting affidavit have not been fully or finally adjudicated. The judgment creditors can point to no provision of Texas garnishment law that authorizes a court to order the Garnishees to pay funds into the court registry or issue a bond to secure payment of a judgment that might subsequently be entered against the Garnishees. Instead, under the statutory scheme, the only method of satisfying a judgment against a garnishee that declines to pay it voluntarily is through a writ of execution after judgment is rendered. Tex. R. Civ. P. 668. At bottom, neither Texas law nor the court's inherent powers support the Garnishors' request for a bond.

Nonetheless, the judgment creditors seek to force Garnishees to pay for what the Congo will not. Garnishees did not cause the Congo's problems in repaying its debts, or the judgment creditors' problems in collecting the Congo's bad debts, which FG, Af-Cap and Walker knew were bad debts when they acquired them. Nor should Garnishees be forced to provide a solution for those problems now. Indeed, no one has offered any solution as to how in practice Garnishees are expected to remove from the Congo oil which the Congo considers its own and which the Congolese courts have determined should be delivered to it. The judgment creditors' proposed expansion of the power of the federal district courts to require a bond in this instance is without historical predicate, guidance from Congress, or deference to state law prohibitions on pre-judgment attachment. As a result, this Court does not have the inherent authority to require Garnishees to post a multi-million bond or deposit funds into the court registry.

### B. The Pending Immunity Appeals Deprive this Court of Jurisdiction to Enter Affirmative Relief Against Garnishees For the April Lifting

The Congo and Garnishees have taken collateral order appeals from the Court's prior orders that determined that the Congo's in-kind royalty and SNPC's working interest are not protected by sovereign immunity under the Foreign Sovereign Immunities Act, 28 U.S.C. §1609-1610. The Fifth Circuit heard arguments on two of those appeals on February 7, 2006. FG itself

has argued in responses to Garnishees' prior dispositive motions that the collateral order appeals deprive this Court of jurisdiction to rule on motions arising out of the orders authorizing garnishment of the royalty obligations.

More specifically, in filings made in opposition to Garnishees' motion to dismiss the October 2004 writs for lack of jurisdiction and improper service, Garnishees' motion to quash the October 2004 writs, and Garnishees' motion for summary judgment on the October 2004 writs – all of which were filed after the collateral order appeal was taken for the Order authorizing the issuance of the October 2004 writs – FG told this Court that "the filing of a Notice of Appeal has divested this Court of jurisdiction over the Orders directing garnishment of the royalty obligations owed by Garnishees to Congo" and that "[a]s it is currently without jurisdiction over the garnishment of the royalty obligations included in the Orders, any decision rendered in this Court regarding the Orders prior to the Fifth Circuit's disposition of the appeal will be a nullity and without effect." See Subject to the Effect of The Republique du Congo's and Garnishees' Notice of Appeal, FG Hemisphere Associates, L.L.C.'s Response in Opposition to the Amended Motion of CMS Nomeco Congo Inc., The Nuevo Congo Company, and Nuevo Congo Ltd. for Summary Judgment, at 4, 6.

Under Fifth Circuit authority, the district court retains the right to rule only on motions that do not implicate the immunity determination or require the party claiming immunity to defend the action. *Kiser v. Garrett*, 67 F.3d 1166, 1168-1170 (5th Cir. 1995); Wright & Miller, Federal Practice and Procedure §3911 at 362-365. Yet, any effort to impose a bond requirement on Garnishees by virtue of the Congo's action in taking its property in its own territory forces the immunity determination. If the property sought to be garnished is immune from garnishment under the FSIA, then no bond requirement would be appropriate. But the FSIA issues are

currently before the Fifth Circuit in the collateral order appeals. Thus, by virtue of the collateral order appeals on the immunity issue, this Court lacks jurisdiction to impose a bond requirement on Garnishees at this time.

Furthermore, the Fifth Circuit law is clear that this Court may not proceed against the Congo or its property pending the collateral order appeals on the immunity issue. Specifically, in *Williams v. Brooks*, 996 F.2d 728, 729 (5th Cir. 1993), the Fifth Circuit held that the "filing of the interlocutory appeal on the immunity issue divested the district court of jurisdiction to proceed against [the party claiming entitlement to immunity]," because "[i]mmunity, whether qualified or absolute, is an entitlement to be free from the burdens of time-consuming pre-trial matters and the trial process itself." *Id.* A determination that Garnishees should be required to post a bond would require this Court to decide that its writs are valid and do not attempt to seize property that is immune under the FSIA. Under *Williams*, the collateral order appeals divested this Court of jurisdiction to grant affirmative relief for alleged violation of the garnishment writs.

### C. This Court Cannot Grant Affirmative Relief Against Garnishees Before Deciding Garnishees' Personal Jurisdiction, Subject Matter Jurisdiction, and Improper Service Defenses

Even if limitations on the Court's inherent powers and the pending immunity appeals did not deprive this Court of the authority to enter affirmative relief against Garnishees for the April 2006 oil lifting in the Congo, this Court's deferral of a decision on Garnishees' jurisdiction and service objections does.

In its Order signed September 13, 2005, 2005, a copy of which is attached hereto as Exhibit J, this Court declined to address Garnishees' jurisdiction and service objections, concluding that those objections were "not ripe for adjudication" by virtue of the pending Fifth Circuit immunity appeals. The Court ruled that "[u]pon resolution of their appeal, the garnishees

may, at their discretion, refile the motion." However, the Court has now indicated at the hearing on March 29, 2005, that it is considering ordering affirmative relief against Garnishees in the form of an Order requiring posting of a bond because of the Congo's April 2006 oil lifting in the Congo.

A threshold requirement to the entry of any affirmative relief against Garnishees is a determination by this Court concerning its jurisdiction over the person of Garnishees. As the Supreme Court said in *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999), "Personal jurisdiction . . . is 'an essential element of the jurisdiction of a district . . . court,' without which the court is 'powerless to proceed to an adjudication.'" (quoting *Employers Reinsurance Corp. v. Bryant*, 299 U.S. 374, 382 (1937)). The Fifth Circuit has applied this rule to preliminary equitable relief, holding that a district court cannot grant a preliminary injunction while deferring the making of findings on personal and subject matter jurisdiction issues. *Enterprise Int'l, Inc. v. Corporacion Estatal Petrolea Ecuatoriana*, 762 F.2d 464, 470-471 (5th Cir. 1985). The Court in *Enterprise* noted the breadth of this rule, quoting its early decision in *Eighth Regional War Labor Bd. v. Humble Oil & Ref. Co.*, 145 F.2d 462, 464 (5th Cir. 1944) for the proposition that "the question of jurisdiction is always vital. A court must have jurisdiction as a prerequisite to the exercise of discretion." *Enterprise*, 762 F.2d at 470-471 (quoting *Eighth Regional War Labor Bd.*, 145 F.2d at 464).

This Court has made no findings of subject matter jurisdiction or personal jurisdiction (either from the standpoint of due process or sufficiency of service) related to the garnishment writs issued in December 2004 and October 2005, and under *Enterprise*, any order granting preliminary equitable relief against Garnishees is improper.

Furthermore, if the Court now proceeds to decide the jurisdictional and service issues, the evidence before the Court makes it clear that jurisdiction is lacking. The circumstances existing in October and December 2004, as well as in October 2005 when the latest writs were issued, and in February 2006 when FG attempted to serve them, demonstrate that the district court lacked jurisdiction over Garnishees, depriving the Court of jurisdiction to enter any affirmative relief against Garnishees.

Garnishees had no offices, no business activities, and no personnel in Texas after July 2004.[29] The changes in the location of Garnishees' activities and personnel arose out of stock purchase transactions in September 2002 and July 2004 that were completely unrelated to litigation between the Congo and its judgment creditors.[30] In September of 2002, related to a transaction by which the CMS Energy group of companies effected its exit from the oil and gas business, CMS Nomeco and twelve of its affiliates with operations in seven countries were sold to the Perenco group.[31] Between October 2002 and February 2004, the activities of CMS Nomeco that previously had been performed in the United States were moved to the Congo and to Perenco's European headquarters, consistent with the typical practice of companies in the Perenco group.[32] The transition of activities out of the United States arose out of the Perenco acquisition and was totally unrelated to the efforts of judgment creditors of the Congo to collect judgments against the Congo.[33] Similarly, in July 2004, the Perenco group acquired Nuevo Congo Company and Nuevo Congo Ltd. in a stock transaction with Plains Exploration.[34] The acquisition transactions were consummated before any court ever held that the Congo's royalty

---

[29] *See* the Declaration of Maryse Bernard attached hereto as Exhibit B and the Declaration of Brian Wrathmell attached hereto as Exhibit H.
[30] *See* the Declaration of Roland Fox attached hereto as Exhibit I.
[31] *Id.*
[32] *Id.*
[33] *Id.*
[34] *Id.*

was not immune from garnishment under the FSIA, and the transactions were unrelated to the garnishment litigation, though the motivation for the transactions should be irrelevant in any event, as Garnishees were not obligated to order their business for the benefit of the Congo's judgment creditors.

Under the Due Process Clause, a non-resident must have minimum contacts with the forum state sufficient to give rise to either "specific" or "general" jurisdiction, and subjecting the non-resident defendant to jurisdiction must be consistent with "traditional notions of fair play and substantial justice." *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 343 (5th Cir. 2004). Garnishees do not have sufficient minimum contacts to support the exercise of either specific or general jurisdiction. Specific jurisdiction exists when the defendant purposefully directed activities toward the forum state or purposefully availed itself of the privileges of conducting activities there, and the controversy arises out of or is related to the defendant's contacts with the forum state. *Id.* at 343. The garnishment action does not arise out of any activities by Garnishees personally directed to Texas. Indeed, in October and December 2004 and October 2005, when the writs issued, and at the time of attempted service of those writs, all of Garnishees' activities relating to the Convention were outside of the United States.[35]

Further, the undisputed evidence shows that none of Garnishees has the type of continuous and systematic contacts with Texas necessary to support the exercise of general jurisdiction.[36] As the Fifth Circuit has held, "the continuous and systematic contacts test is a difficult one to meet, requiring extensive contacts between a defendant and a forum."

[35] *See* the Declaration of Maryse Bernard attached hereto as Exhibit B and the Declaration of Brian Wrathmell attached hereto as Exhibit H.
[36] *Id.*

*Submersible Systems, Inc. v. Perforadora Central, S.A. d C.V.*, 249 F.3d 413, 419 (5th Cir. 2001).

Garnishees' filing of the motion to dissolve the 2002 writs in 2002 did not confer personal jurisdiction over the Garnishees for the writs FG sought and obtained in October and December 2004 and October 2005. Under controlling Texas authority, each set of garnishment writs represents a separate suit, requiring new service and a new answer. *See Citizens Nat'l Bank in Ennis v. Hart*, 321 S.W.2d 319, 320-21 (Tex. Civ. App. – Fort Worth 1959, writ ref'd) ("In garnishment matters the writ is . . . the original process and initiatory step in the prosecution of a suit"); *Varner v. Koons*, 888 S.W.2d 511, 513 (Tex. App. – El Paso 1994, orig. proc.) ("A garnishment action, although ancillary to the underlying suit, is a separate proceeding"). Tex. R. Civ. P. 659 ("the judge, or clerk, . . . shall docket the case . . . and shall immediately issue a writ of garnishment directed to the garnishee, commanding him to appear before the court").

Because a garnishment writ captures only obligations that are owed to the judgment debtor as of the service of the writ and as of the answer date, new and separate garnishment actions are required to capture future obligations. *Consolidated Gasoline Co. v. Jarecki Mfg. Co.*, 72 S.W.2d 351 (Tex. App. 1934), *opin. adopted*, 129 Tex. 644, 105 S.W.2d 663 (1937) (a garnishment writ only captures obligations owed as of the date of service of the writ and the date the garnishee is required to file its answer, and "impound[s] existing debts, rather than future accruing debts"); *Newsome v. Charter Bank Colonial*, 940 S.W.2d at 163-164 (Tex. App. – Houston [14th Dist.] 1996, writ denied) (same); *Matter of Bohart*, 743 F.2d at 324 ("the garnishment traps the indebtedness owed when the writ was served as well as that owed when the garnishee's answer is filed"). Under these authorities, each time Garnishees are served with new writs, they are entitled to assert jurisdictional defenses that existed at the time of the service

of the writs. *Cf. Prejean v. Sonatrach, Inc.*, 652 F.2d 1260, 1270 (5th Cir. 1981) ("personal jurisdiction must exist at the time service is made").

Applying these principles to the facts shown in the attached declarations, Garnishees were not subject to jurisdiction for the writs issued in October 2004, December 2004, and October 2005. It is important to note, however, that the only writs that potentially implicate the April 2006 lifting are those issued in October 2005 and purportedly served in mid-February 2006. As noted above, a garnishment writ captures only obligations owed as of the date of service of the writ and the date the garnishee is required to file its answer, and a garnishment writ gives the garnishor no greater rights against the garnishee than those of the judgment debtor. *Beggs*, 106 S.W. at 1041; *Rowley v. Lake Area Nat'l Bank*, 976 S.W.2d 715, 718-19 (Tex. App.—Houston [1st Dist.] 1998, pet. denied). Thus, the rights of a garnishor to recover property of the judgment debtor from the garnishee are limited to the rights that the judgment debtor had to recover that property from the garnishee on the service date and answer date for the writs.

Because there is no conceivable argument that the 2004 writs captured an April 2006 oil lifting, the crucial jurisdictional and service inquiry for the dispute over the upcoming April 2006 oil lifting is whether this Court had personal and subject matter jurisdiction over the property and over Garnishees in February 2006, when FG attempted to serve Garnishees with the writs issued in October 2005. There is no basis whatsoever for any conclusion that Garnishees were subject to jurisdiction in Texas at that time, having had no offices, no business activities, and no personnel in Texas for more than a year and a half.[37]

Furthermore, even if the due process objections to jurisdiction are ignored, jurisdiction cannot be exercised without proper service, and there is no basis for any conclusion that service

---

[37] *See* the Declaration of Maryse Bernard attached hereto as Exhibit B and the Declaration of Brian Wrathmell attached hereto as Exhibit H.

on Garnishees' counsel, Garnishees' counsel's secretary, or the Texas Secretary of State of the latest writs was sufficient and effective to confer jurisdiction over Garnishees. Under Texas law, service must be effected on the president, vice-president, or registered agent of a defendant. *Williams v. GTE*, 2001 WL 276868 (N.D. Tex. March 19, 2001). FG has failed to serve any of the Garnishees in that fashion with the October 2005 writs. The returns of service on file with this Court reflect attempted service on February 14 and 15, 2006, on Garnishees' counsel, the secretary of Garnishees' counsel, and the Texas Secretary of State. Texas law makes clear that service on counsel and his secretary is not proper, nor is service on the Texas Secretary of State appropriate in this case. FG has made no allegations supporting substitute service on Garnishees through the Texas Secretary of State, and as the Fifth Circuit has held, jurisdiction is not conferred by substitute service on the Texas Secretary of State under the Texas long arm statute unless the complaint alleges all of the jurisdictional facts set out in the statute. *Freight Terminals, Inc. v. Ryder System, Inc.*, 461 F.2d 1046, 1052 (5th Cir. 1972). Even if such allegations had been made, Garnishees are not doing business in the State of Texas, have no regular place of business in the State of Texas, have no agents or officers in Texas, are not required to maintain a registered agent for service of process in the State of Texas, and are not amenable to jurisdiction in the State of Texas under the Due Process Clause of the U.S. Constitution, rendering substituted service on the Texas Secretary of State improper and insufficient. *See Carmichael v. United Technologies Corp.*, 835 F.2d 109, 112 (5th Cir. 1988) ("[N]one of the businesses mentioned has agents or officers in Texas or does business in Texas, nor did the cause of action arise from business dealings in Texas. Service on the Secretary of State was therefore ineffective under the Texas Long-Arm Statute").

In the same way, there was no connection whatsoever between the oil in the Congo and the State of Texas when the October 2005 garnishment writs were purportedly served in February 2006. A garnishment action has an "in rem" aspect, and under state garnishment law, the situs of an obligation for purposes of determining the court's authority to exercise jurisdiction over that property is "where the debtor is or may be found." *Missouri, Texas, and Kansas Railway Co. of Texas v. Swartz*, 115 S.W. 275, 276 (Tex. Civ. App. 1909, no writ).

In *Cooper v. Reynolds*, 77 U.S. 308, 319 (1870), the United States Supreme Court recognized that "the seizure of property, or that which, in this case, is the same in effect, the levy of the writ of attachment on it, is the one essential requisite to jurisdiction. . . . [W]hen such a writ is returned into court, the power of the court over the res is established." Thus, jurisdiction over the property sought to be attached is acquired when the writ is issued and served. If the property is not present within the jurisdiction of the court at the time of issuance and service of the writ, the court is without jurisdiction. *Id.*; see also 7 C.J.S. *Attachment* § 89 ("for a court to have jurisdiction to attach property, the property owned or belonging to the defendant must be present, actually or constructively, within the territorial limits over which the court may exercise its power. . . . The issuance of the writ and its levy on the property within the territorial limit of the court's jurisdiction brings the property under the jurisdiction of the court"). Unless the property sought to be garnished was located in Texas at the time of issuance and service of the latest writs, the district court lacked jurisdiction to garnish the property.

Under the authorities discussed above, the district court lacked in rem jurisdiction if none of the Garnishees were subject to suit in Texas in February 2006. For the reasons set out above in the discussion of personal jurisdiction, none of Garnishees was subject to suit in Texas at that

time, and the district court lacked jurisdiction to garnish the property that is the subject of the April 2006 lifting.

Having no jurisdiction over Garnishees or the property sought to be garnished, this Court has no authority to enter any affirmative relief of any kind against Garnishees.

**D. The Act of State Doctrine Prevents This Court from Ordering Affirmative Relief Against Garnishees For the April 2006 Lifting Because it Requires this Court to Adjudicate the Validity of Acts of a Foreign State in its Own Territory**

The U.S. Supreme Court has explained "the act of state doctrine springs from the thoroughly sound principle that on occasion individual litigants may have to forgo decision on the merits of their claims because the involvement of the courts in such a decision might frustrate the conduct of the Nation's foreign policy." *First National City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 769 (1972). "In the act of state context, even if the defendant is a private party, not an instrumentality of a foreign state, and even if the suit is not based specifically on a sovereign act, we nevertheless decline to decide the merits of the case if in doing so we would need to judge the validity of the public acts of a sovereign state performed within its own territory." *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1113 (5th Cir. 1985) (citing *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 428 (1964)).

The act of state doctrine received its classic expression in *Underhill v. Hernandez*, 168 U.S. 250 (1897):

> Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.

*Id.* at 252. In short, the act of state doctrine prohibits a U.S. court from examining the validity of a taking by a foreign state of property within its own territory, or from sitting in judgment on

other acts of a governmental character done by a foreign state within its own territory and applicable there. *Underhill v. Hernandez,* 168 U.S. at 252; *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 420 (1964); Restatement (Third) Foreign Relations Law of the United States § 443 (1987).

These principles are fully applicable to the facts here. In December 2004, in July 2005, and again in March of 2006, court orders were sought in the Congo compelling Garnishee CMS Nomeco, as operator, to deliver crude oil located in Congolese territorial waters to SNPC.[38] The orders were sought by the Ministry of Hydrocarbons, acting on behalf of the Congo, and by SNPC.[39] Orders were subsequently entered by Congolese courts granting the relief sought and even requiring "that this order be executed with the assistance of the law enforcement authorities in the event there is resistance."[40] The Congo court orders on their face, and the Minister of Hydrocarbons by direct communication with CMS Nomeco's president, threatened police action to enforce the orders of the Congolese court in the event of non-compliance.[41] Each of the following is an "act of state" within the meaning of the act of state doctrine: (1) the Congo's act of seeking court orders compelling CMS Nomeco, as operator, to deliver the oil; (2) the orders of the Congolese court compelling CMS Nomeco to deliver the oil; and (3) the threat of police action to enforce the orders of the Congolese court.

The Congolese court orders were sought by both the Republic of Congo itself and by SNPC.[42] The Republic of Congo is a foreign sovereign and a stipulation has been entered giving

---

[38] *See* Declaration of Maryse Bernard attached as Exhibit B and Exhibits 3, 4, 7, 8, and 13 thereto.
[39] *Id.*
[40] Exhibits 7 and 8 to Exhibit B, p. 5.
[41] *See* Declaration of Maryse Bernard attached as Exhibit A and Declaration of Maryse Bernard attached as Exhibit B and Exhibits 3, 4, 6, 7, 8, and 13 thereto.
[42] *See* Exhibit 3 to Exhibit B (Order of December 28, 2004) ("The Republic of Congo, Ministry of Hydrocarbons, filing through its legal representatives. . .") and Exhibit 4 to Exhibit B (Order of December 28, 2004) ("Societé

SNPC the same status. In addition, the Congo court itself is a foreign state actor. *See Philippine National Bank v. United States District Court,* 397 F.3d 768 (9th Cir. 2005) ("A judgment of a court may be an act of state"); *Yahoo Inc. v. LaLigue Contre Le Racisme Et L'Antisemitisce,* 433 F.3d 1199, 1226 (9th Cir. 2006) (holding a French Court's Order to be an act of state). Likewise, if law enforcement authorities are used to enforce the Congolese court orders, those officers would be state actors fully empowered by the court orders and acting within the scope of their authority.

In suggesting that this Court has the authority to require Garnishees to post a bond or pay money into the court registry upon an oil lifting by the Congo based on "violations" of this Court's writs, the judgment creditors are asking this Court to ignore, both legally and as an accomplished fact, the acts of a sovereign actor committed in that sovereign's territory in taking property within its own territory. The judgment creditors ask this Court to declare these acts of state invalid and to proceed as if they had not occurred. By requesting that Garnishees be required to put up a bond in an amount equivalent to the dollar value of the oil taken by the Congo, the judgment creditors are asking this Court to hold that the taking of the oil, an official action by a foreign sovereign in its own territory, was ineffective. The act of state doctrine precludes such a holding. As the Fifth Circuit has said, "[w]hen a foreign government performs an act of state which is an accomplished fact, that is when it has the parties and the *res* before it and acts in such a manner as to change the relationship between the parties touching the *res*, it would be an affront to such foreign government for courts of the United States to hold that such act was a nullity." *Callejo*, 764 F.2d at 1122-23 (quoting *Tabacalero Severiano Jorge, S.A. v. Standard Cigar Co.*, 392 F.2d 706, 715 (5th Cir. 1968)).

---

Nationale des Pétroles du Congo, (acronym: SNPC) a government- owned industrial and commercial enterprise. . . filing through its legal representative . . ."). *See also* Exhibits 7, 8, and 13 to Exhibit B.

The judgment creditors have previously argued that *Af-Cap, Inc. v. Republic of Congo,* 383 F.3d 361 (5th Cir. 2004) rejects any act of state argument, but the judgment creditors misconstrue the Fifth Circuit's analysis. In *Af-Cap*, the Court was presented only with FSIA issues. In addressing the situs of the Congo's in-kind royalty under the FSIA, the Congo and Garnishees relied on act of state cases addressing the situs of intangible property. The Fifth Circuit held that the act of state situs analysis did not apply to a "mere dispute over the payment of a debt the Congo does not dispute" because there had been no "public act" undertaken by a sovereign nation. *See* 383 F.3d 361, 371 n.14. At that time, no Congo court orders had been sought or issued, no threats of use of public force in Congolese territory had been made, and no oil had been taken by the Congo under the authority of Congo court orders and threats. It is the Congo's acts that have occurred subsequent to the decision in *Af-Cap* that the judgment creditors are asking this Court to invalidate and hold ineffective, and it is those acts, not addressed by the Court in *Af-Cap*, that require application of the act of state doctrine.

The *Philippine National Bank* case, *supra,* supports this conclusion. In that case, the district court ignored an order of the Philippine Supreme Court for a transfer of assets that the U.S. court had enjoined, finding that the Philippine court had violated "due process by any standard." 397 F.3d 768, 771. The district court found that the Philippine judgment was not entitled to any deference, and gave it none, entering a show cause order as to why the defendant should not be held in contempt for transferring the property. The Ninth Circuit granted a mandamus petition filed by the defendant, holding that the act of state doctrine was applicable and precluded the district court from conducting contempt proceedings. The Ninth Circuit held that:

> The district court's orders in issue violated this principle [the act of state doctrine]. In order to obtain assets from the Philippine Bank or to hold the Bank

> in contempt for the transfer of those assets to the Republic, the district court necessarily (and expressly) held invalid the forfeiture judgment of the Philippines Supreme Court. We conclude this action violated the act of state doctrine.

397 F.3d 768, 772.

In finding an act of state, the Ninth Circuit depended on a number of factors that are also present in this case. First, they noted that the judgment of the Philippine Supreme Court gave effect to the public interest of the Philippine government. Here, the Congolese court found that the garnishment orders were "in conflict with public order and interfere[] with the sovereignty of the Congolese state." *See,* Exhibit __ to Exhibit B (order of July 4, 2005). The court also found it significant that the Philippines action was not a mere dispute between private parties, but was instead "initiated by the Philippine government. . ." Likewise, the Congolese government initiated the Congo proceedings leading to the orders.

This Court may not approve of the procedure employed by the Republic of Congo in seeking these orders; neither did the district court in the *Philippine Bank* case. Likewise, the Court may be as unimpressed with the process employed in the Congolese courts as the court in *Philippine Bank* was with the actions of the Philippine court. Nonetheless, the act of state doctrine prohibits this Court from brushing aside these public acts of a sovereign nation.

The judgment creditors' characterization of the property in question as an intangible debt does not change the act of state analysis. Even if the Court accepts the judgment creditors' characterization as correct, the Fifth Circuit has held that a debt owed to a foreign sovereign has its situs *for act of state purposes* in the foreign state's territory if the foreign state is in a position to perform a *fait accompli* in collecting its debt in its own territory. *Tabacalera Serviano Jorge, S.A. v. Standard Cigar Co.,* 392 F.2d 706, 715 (5th Cir. 1968). The Court said that



> The underlying thought expressed in all of the cases touching on the Act of State Doctrine is a common-sense one. It is that when a foreign government performs an act of state which is an accomplished fact, that is when it has the parties and the *res* before it and acts in such a manner as to change the relationship between the parties touching the *res*, it would be an affront to such foreign government for courts of the United States to hold that such act was a nullity. Furthermore, it is plain that the decisions took into consideration the realization that in most situations there was nothing the United States courts could do about it in any event.

392 F.2d 706, 715.

This, of course, is exactly the situation here. The Congo and the Congolese courts have Garnishees and the *res* before them. They have acted to change the relationship between Garnishees, the Congo, and the *res* by acts wholly within Congolese territory. The judgment creditors challenge the validity of those acts of the Congolese state wholly within Congolese territory, which is precisely what the act of state doctrine prevents.

The U.S. government has recognized that the foreign relations concerns that underlie the act of state doctrine are implicated by the circumstances at issue in this case. In an appeal now pending in the Fifth Circuit by the Congo of a sanctions order entered by the Western District of Texas for the Congo's alleged failure to comply with a turnover order directed to the Congo's in-kind royalty, the United States as an amicus said the following: "The potential for affront [to a foreign state] may be particularly acute where the district court issues an injunctive order, such as the turnover order in this case, that purports to control the foreign state's conduct within its own borders."[43] The United States noted that "[w]ere a foreign court to assert the same power over the United States Government that the district court has asserted in this litigation over the Republic of Congo, ordering the United States Government to turn over assets within this

---

[43] *See* Brief of the United States as Amicus Curiae in Support of Defendant/Appellant The Republic of Congo, filed in Case No. 05-51168, in the United States Court of Appeals for the Fifth Circuit, a copy of which (without appendix) is attached hereto as Exhibit K, at 12-13.

country to a foreign plaintiff in direct contravention of our nation's foreign policy, it would undoubtedly lead to great public outcry."[44]

Under the act of state doctrine, these foreign relations concerns require that the Court not adjudicate the validity of the Congo's acts taken in its own territory. Yet that is precisely what the judgment creditors ask of this Court. The act of state doctrine precludes the granting of any affirmative relief against Garnishees related to the Congo's acts in taking liftings of oil in its own territory.

## E. The Foreign State Compulsion Doctrine Precludes Affirmative Relief Against Garnishees

Garnishees had and have no choice but to comply with the Congo court orders, short of engaging in a shooting war with the Congolese government in its own territory. Garnishees' operations are conducted completely within the Congo's sovereign territory, and the Congo court orders compel action within the Congo's borders relating to Garnishees' activities there. The Congo court orders require that Garnishees allow an oil lifting in the Congo, in spite of the United States garnishment writs.

Section 441 of the Restatement (Third) of Foreign Relations Law provides that "[a] state may not require a person... to refrain from doing an act in another state that is required by the law of that state...." Restatement (Third) of the Foreign Relations Law § 441 (1987). A comment to that provision clarifies that "[i]n determining preference between conflicting exercises of jurisdiction to prescribe, this section generally accords preference to the state in which the act is to be done (or is not to be done)." *Id.* at cmt. a.

The Ninth Circuit relied upon this Restatement provision in the case of *Reebok Intern. Ltd. v. McLaughlin*, 49 F.3d 1387 (9th Cir. 1995). There, a federal district court preliminarily

---

[44] *Id.* at 20-21.

enjoined a Luxembourg bank from transferring funds out of defendant's account. *Id.* at 1389. Soon thereafter, a Luxembourg court issued an order instructing the Luxembourg bank to release the funds to the defendant. *Id.* After the bank complied with the Luxembourg court order, the federal district court found the bank in contempt for violating the freeze order. *Id.* The Ninth Circuit reversed, reasoning that "it would defy logic were we to decide that the district court could hold [the bank] in contempt for complying with the order of the Luxembourg court." *Id.* at 1392 (citing Restatement (Third) of the Foreign Relations Law § 441). The Luxembourg bank, situated in Luxembourg, necessarily had to comply with Luxembourg law.

Garnishees' situation calls for the same result. The Yombo Field operations are within the Congo's sovereign territory. The Congo court orders compelled action within the Congo's borders relating to activities wholly occurring there. In such circumstances, the law precludes the Court from penalizing Garnishees for complying with Congolese law. The legal principles of foreign state compulsion recognized in Section 441 of the Restatement preclude the granting of relief against Garnishees for such action.

The judgment creditors' allegations of "collusion" do not affect this result. As a threshold matter, the judgment creditors have not brought forward any *evidence* (as opposed to unsupported allegations) of collusion, as discussed in detail in the Facts section above. Yet, even their allegations do not constitute the type of collusion that courts have used to avoid application of the foreign state compulsion doctrine.

An illustration is the Second Circuit's decision in *Motorola Credit Corp. v. Uzan*, 388 F.2d 39 (2d Cir. 2004). In *Motorola*, the defendant relied on Section 441 of the Restatement arguing that injunctions entered by a Turkish court that prohibited the defendant from transferring corporate stock barred a U.S. court from ordering such a transfer. The Second

Circuit noted the rule under Section 441 of the Restatement that "a state may not require a person to do an act in another state that is prohibited by the law of that state," and that the rule is "a fundamental principle of international comity." *Id.* at 60. The Second Circuit recognized an exception to this rule that "orders of a foreign court are not entitled to comity if *the litigants who procure them* have 'deliberately courted legal impediments' to the enforcement of a federal court's orders." *Id.* (quoting *Societe Internationale v. Rogers*, 357 U.S. 197, 208-09 (1958)) (emphasis added)). The district court in that case found that the purported plaintiffs in the Turkish proceedings had no apparent motive to file the lawsuits in Turkey, that the filings in different cases were identical though filed by different parties, and that there was evidence that the defendant had procured the orders to defeat the U.S. court's jurisdiction.

The importance of a showing that the defendant "procured" the orders is illustrated by the case of *Interamerican Refining Corp. v. Texaco Maracaibo, Inc.*, 307 F. Supp. 1291 (D. Del. 1970). In that case, the plaintiff sued the defendants for refusing to sell Venezuelan oil to plaintiff. The defendants were subject to an order from the Venezuelan government that prohibited the sale. The court granted summary judgment for the defendants based on the foreign compulsion defense, holding that there was no evidence that defendants were acting voluntarily. *Id.* at 1297. Significantly, the court also noted that there was no evidence that the defendants had "procured the Venezuelan order." *Id.*

Like the situation in *Interamerican Refining*, and unlike the situation in *Motorola*, there has been no showing that Garnishees "procured" the Congo court orders. To the contrary, the facts before the Court demonstrate that the Congo and SNPC, with virtually no notice to Garnishees, sought and obtained court orders on their own volition. The judgment creditors have made no showing of any facts that would justify departure from the general rule stated in Section